ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (168593)
DANIELLE S. MYERS (259916)
FRANCISCO J. MEJIA (306477)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
drobbins@rgrdlaw.com
dmyers@rgrdlaw.com
fmejia@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| OLGA GÉMESI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> RxSIGHT, INC., RON KURTZ, and SHELLEY THUNEN, <br><br> Defendants. | Case No.   8:25-cv-02093 <br><br> CLASS ACTION <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff Olga Gémesi ("plaintiff") alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of RxSight, Inc. ("RxSight" or the "Company"), the Company's press releases and conference calls, and analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §78aa, as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act because RxSight is headquartered in this District at 100 Columbia, Aliso Viejo, California 92656, certain of the defendants reside in this District, and defendants' wrongful acts occurred in this District.  Most of the evidence exists in this District and the harm caused by defendants emanated from and had effects in this District.

3.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## INTRODUCTION

4.      This is a securities fraud class action on behalf of all purchasers of RxSight common stock between May 7, 2024 and July 8, 2025, both dates inclusive

1  (the "Class Period"), against RxSight, its Chief Executive Officer ("CEO"), and its
2  Chief Financial Officer ("CFO") for violations of §§10(b) and 20(a) of the 1934 Act
3  and SEC Rule 10b-5 promulgated thereunder.

4    5.    RxSight is a commercial-stage medical technology company focused
5  on the treatment of cataracts.  RxSight's principal product is the RxSight Light
6  Adjustable Lens system, which is comprised of an intraocular light adjustable lens
7  ("LAL") and a light delivery device ("LDD").  The Company claims that its
8  proprietary technology enables a treating physician to customize a patient's visual
9  acuity after surgery.

10    6.    To use the RxSight system, a doctor first performs a standard cataract
11  procedure to implant an LAL within a patient's eye.  Two to three weeks following
12  the surgery, the patient returns to the doctor's office and receives a diagnostic eye
13  exam to determine the appropriate lens prescription.  Using ultra-violet light
14  generated by an LDD, the doctor customizes the shape of the implanted LAL within
15  the patient's eye to optimize the patient's vision.  A patient may return to the doctor's
16  office to receive up to three adjustments to the LAL.  In the event that no change to
17  the LAL is required, the LAL is "locked-in," which prevents the LAL from being
18  further adjusted.

19    7.    Prospective RxSight customers (*i.e.*, ophthalmology practices) face
20  significant start-up costs when electing to install the Company's technology at their
21  practices.  For example, RxSight sells each LDD for an average selling price of
22  $130,000 and sells each LAL for $1,000.  In addition, managing physicians must
23  ensure their practices are adequately staffed and trained to perform the postoperative
24  diagnostic assessments and to administer all follow-on adjustments and lock-ins.

25    8.    RxSight's business follows a "razor/razor-blade" model: grow the
26  installed base of high-priced LDDs to drive recurring, higher-margin LAL
27  procedures.  Successful adoption depends on effective post-operative workflow,
28  training, and ongoing field support.

- 2 -

9.      Throughout the Class Period, defendants – including CEO Ron Kurtz and CFO Shelley Thunen – touted rising utilization "across the installed base," claimed newer customer cohorts were adopting as fast as or faster than prior cohorts, and represented that RxSight's field teams effectively trained and supported practices to accelerate growth.

10.     These statements were materially false and misleading.  In truth, RxSight's field organization was inadequately structured and underperforming; newer cohorts needed more support than prior cohorts and were adopting more slowly; and utilization across the installed base was declining.  As a result, incremental LDD placements did not translate into expected LAL volume, undermining the Company's growth model.

11.     Unaware of these adverse facts, investors purchased RxSight common stock at artificially inflated prices.  On May 9, 2024, the Company capitalized on this inflation by selling more than 1.7 million shares at $56 per share, raising nearly $100 million.

12.     The truth began to emerge on April 2, 2025, when RxSight disclosed a sequential decline in quarterly LAL sales (from ~29,000 to ~27,600 procedures) and cut full-year revenue guidance by roughly $24 million.  The price of RxSight common stock fell approximately 38% the next day.

13.     On July 8, 2025, RxSight further revealed that LDD sales had collapsed 45% sequentially and LAL sales had declined for a second consecutive quarter. Defendants admitted newer customers had been adopting more slowly because they required more support and announced a "commercial pivot" to overhaul field support.  The price of RxSight common stock fell roughly 38% on this disclosure.

14.     As a result of defendants' materially false and misleading statements and omissions, and the subsequent partial disclosures, the price of RxSight common stock declined dramatically when the truth was revealed, causing significant damage to investors.

**PARTIES**

15.    Plaintiff Olga Gémesi purchased RxSight common stock at artificially inflated prices during the Class Period and suffered damage as a result of defendants' alleged misconduct as set forth in the certification attached hereto and incorporated by reference herein.

16.    Defendant RxSight's common stock is listed and widely traded on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol RXST.  As of July 31, 2025, there were over 40 million shares of common stock outstanding.

17.    Defendant Ron Kurtz has served as RxSight's President and CEO and on RxSight's Board of Directors since 2016.  As CEO, defendant Kurtz spoke on RxSight's behalf in releases, conference calls, and SEC filings.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Kurtz certified the Company's Forms 10-Q filed with the SEC on May 6, 2024, August 5, 2024, November 7, 2024, and May 7, 2025 and the Form 10-K filed with the SEC on February 25, 2025.

18.    Defendant Shelley Thunen has served as RxSight's CFO since February 2017 through July 2024 and as Co-President and CFO since August 2024. In these roles, Thunen spoke on RxSight's behalf in releases, conference calls, and SEC filings.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Thunen certified the Company's Forms 10-Q filed with the SEC on May 6, 2024, August 5, 2024, November 7, 2024, and May 7, 2025 and the Form 10-K filed with the SEC on February 25, 2025.

19.    Defendants Kurtz and Thunen are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and RxSight are collectively referred to herein as "defendants."

20.    During the Class Period, each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential and proprietary information concerning

1  the Company, its operations, business prospects, and overall financial condition. By

2  reason of their positions within the Company, the Individual Defendants obtained,

3  had access to, and/or were in possession of material, adverse nonpublic information

4  concerning RxSight via internal corporate documents and communications with

5  other corporate officers and employees, attendance at management and/or Board

6  meetings (and committees thereof), and via the reports, presentations, and other

7  information provided to them in connection therewith. Because of their possession

8  of such information, the Individual Defendants knew or recklessly disregarded that

9  the adverse facts specified herein had not been disclosed to, and were being

10 concealed from, the investing public.

11       21.    As senior executive officers and controlling persons of a publicly traded

12 company whose common stock was and is registered with the SEC pursuant to the

13 1934 Act, and was and is traded on the NASDAQ and governed by the federal

14 securities laws, the Individual Defendants each had a duty to promptly disseminate

15 accurate and truthful information regarding the Company's operations, business,

16 financial statements, and financial metrics, and to correct any previously issued

17 statements that had become materially misleading or untrue, so that the market price

18 of RxSight common stock would be based upon truthful and accurate information.

19 Defendants' materially false and misleading misrepresentations during the Class

20 Period violated these specific requirements and obligations.

21       22.    The Individual Defendants, because of their positions of control and

22 authority as officers and/or directors of the Company, were able to, and did, control

23 the content of the various SEC filings, press releases, and other public statements

24 pertaining to the Company during the Class Period. Each Individual Defendant was

25 provided with copies of the documents alleged herein to be misleading before or

26 shortly after their issuance, participated in conference calls with investors during

27 which false and misleading statements were made, and/or had the ability and/or

28 opportunity to prevent their issuance or cause them to be corrected. Accordingly,

each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

23.    After market close on May 6, 2024, RxSight issued a release announcing the Company's 1Q24 financial results, which quoted defendant Kurtz as highlighting the "'continued adoption'" of its LALs and stating RxSight was "'establishing a new standard'" in the premium market.  This statement was materially false and misleading when made because adoption was not broadly "'continu[ing]'" as represented and newer cohorts were lagging and required more support.

24.    That same day, on the 1Q24 conference call, defendant Kurtz emphasized "positive" adoption trends and claimed RxSight would continue to experience "strong adoption," stating in pertinent part that "the adoption trends continue to be very positive" and "we anticipate continued strong adoption."  This statement was materially false and misleading when made because the present-tense assurance of positive adoption across the base omitted internal problems with field support and slower new-cohort ramps, and the touted trajectory proved unsustainable.

25.    On August 5, 2024, in the 2Q24 release, defendant Kurtz claimed RxSight had "'continued to make significant progress in the adoption of adjustability as a new standard in the premium market.'"  This statement was materially false and misleading when made because newer cohorts were adopting more slowly and needed greater support, undercutting the assertion of broad-based, continued progress.

26.    That same day, on the 2Q24 call, defendant Kurtz stated that "[w]e continue to see growth in monthly utilization across the installed base" to 11 LALs

per LDD per month and said this trend had been "accelerated" by the Company's "strategic clinical and marketing teams." This statement was materially false and misleading when made because it suggested field-team-driven growth "across the installed base" while concealing cohort underperformance and support shortfalls; later disclosures confirmed prior existing adoption issues and the need to overhaul field support.

27. Also on the 2Q24 call, defendant Thunen represented that customers in the 2024 cohort were "adding procedures" a "bit more rapidly" than prior cohorts. This statement was materially false and misleading when made because newer customers had been adopting more slowly and required more support.

28. Defendant Thunen further stated that 2023-2024 cohorts had "accelerated faster" and that "all cohorts continue to grow," attributing this to improved training and account management. This statement was materially false and misleading when made because newer cohorts were not accelerating faster and were not consistently growing as represented, due to inadequate field support and greater support needs.

29. On November 7, 2024, in the 3Q24 release, defendant Kurtz highlighted "'ongoing demand and enthusiasm'" for RxSight's products and said the quarter's results "'position[ed]'" RxSight "'for a strong finish to 2024 and for continued success in the years to come.'" This statement was materially false and misleading when made because it ignored mounting utilization and adoption issues that soon manifested in sequential LAL declines and guidance cuts.

30. That same day, on the 3Q24 call, defendant Kurtz touted RxSight's "robust growth in our LDD installed base, surpassing typical seasonal expectations" and praised the "high quality efforts" of the Company's commercial and operations teams. This statement was materially false and misleading when made because it misstated the effectiveness of field support execution and omitted organizational deficiencies that impeded adoption.

31.    During the same call, defendant Thunen said clinical applications people are "very important to adoption" because "their job . . . [is] to get the practice going and ensuring that their doctors and the staff are trained adequately." Defendant Thunen further said the "newer accounts" tended to achieve the same adoption rates "a bit quicker" than older customer cohorts.  This statement was materially false and misleading when made because training/support were not adequate and newer accounts had not ramped quicker; they required more support.

32.    Defendant Thunen added that "more recent installs get to the same place a little bit more quicker," citing internal cohort data and training improvements.  This statement was materially false and misleading when made because newer cohorts actually required more time and support and were adopting more slowly.

33.    During the call, defendant Kurtz stated that "utilization has grown over time and it continues to grow," that "overall the directionally that the numbers are going in the right direction," and described field teams' day-to-day efforts to make practices "grow faster."  This statement was materially false and misleading when made because utilization was not broadly continuing to grow and field support efforts were insufficient while newer cohorts lagged.

34.    On January 12, 2025, RxSight issued its 4Q24 preliminary financial results and provided 2025 revenue guidance of $185 million to $197 million.  This guidance statement was materially false and misleading when made because it assumed sustained utilization/adoption and effective field support that did not exist; RxSight later cut guidance twice.

35.    On February 25, 2025, RxSight repeated the 2025 guidance in the January 12, 2025 4Q24 preliminary results release.  This guidance statement was materially false and misleading when made for the same reasons stated in ¶34.

36.    That same day, on the 4Q24 call, defendant Kurtz claimed that RxSight could "durably grow" through its "traditional and innovative adoption models."  This

1   statement was materially false and misleading when made because durability

2   depended on functioning field support and consistent cohort adoption, which

3   RxSight lacked.

4      37.   Defendant Thunen also represented that RxSight "expect[ed]"

5   utilization within the Company's 2024 customer cohort to "continue to be

6   consistent" with prior customer cohorts, which she claimed all "end up in just about

7   the same place." This statement was materially false and misleading when made

8   because newer cohorts were not consistent with prior cohorts and did not end up in

9   the same place without additional support; adoption was slower.

10     38.   In addition, defendant Kurtz represented that RxSight was "always

11  focused" on providing "the highest level of clinical training" and "field support" to

12  customers and that the Company had "expand[ed]" efforts to drive adoption. This

13  statement was materially false and misleading when made because field support was

14  inadequately organized and failed to deliver necessary interventions.

15     39.   On April 2, 2025, RxSight issued a press release reporting preliminary

16  1Q25 financial results, revealing a surprise revenue shortfall that materially missed

17  consensus estimates by 5%. In addition, the 1Q25 preliminary results release

18  unexpectedly revealed that LAL sales declined sequentially in the quarter. During

19  the corresponding conference call on April, 3, 2025, defendant Kurtz attributed the

20  revenue and LAL sales miss to a "weakened" premium intraocular lens market,

21  competitive sequential launches of new intraocular lenses, and abrupt changes in

22  consumer sentiment, which he claimed resulted in the Company's "first year-over-

23  year drop in same-store LAL sales." As a result, RxSight slashed its annual revenue

24  guidance for fiscal 2025 from a range of $185 million to $197 million to a range of

25  $160 million to $175 million, representing a reduction of nearly $24 million at the

26  midpoint. On this news, the price of RxSight common stock declined from $26.12

27  per share on April 2, 2025 to $16.21 per share on April 3, 2025, representing a

28  decline of nearly 38%, on above-average trading volume. However, the price of

RxSight common stock remained artificially inflated as defendants misattributed causation to external factors while omitting internal drivers – slower new-cohort adoption and deficient field support – later admitted by defendants and evidenced by continued utilization deterioration.

40.    For example, on the April 3, 2025 call, an analyst questioned whether utilization was really being impacted by market trends or whether it was "just a utilization issue specifically to LAL," noting that "we're not necessarily hearing all of those market trends called out by your peers."  In response, defendant Kurtz reiterated that macro/competitor dynamics, not RxSight-specific utilization issues, drove underperformance.  This statement was materially false and misleading when made because it omitted Company-specific adoption and support problems.

41.    Defendant Thunen similarly asserted that the weakening premium market and competitor launches were "really masked by our own performance," implying the issues were external rather than RxSight-specific.  This statement was materially false and misleading when made because it omitted internal utilization headwinds and support failures that were impacting results.

42.    On May 7, 2025, in the 1Q25 release, defendant Kurtz emphasized RxSight's "'strong customer'" interest and said the Company was "'well-positioned to lead the next chapter of growth in the IOL market.'"  This statement was materially false and misleading when made because it overstated positioning while internal adoption/support issues persisted and utilization had already declined.

43.    On the 1Q25 call that same day, defendant Kurtz emphasized the results of a customer survey, stating that most respondents cited negative macroeconomic headwinds as the key reason for reduced LAL procedure volumes, that "almost all practices expressed a desire to expand their LAL and LAL+ volumes," and that some noted a "desire for additional clinical and marketing guidance."  This statement was materially false and misleading when made because it minimized Company-specific

1    causes – support deficits and slower new-cohort adoption – and misled investors

2    about the primary drivers of underperformance.

3         44.    During the call, an analyst asked for further specificity regarding the

4    customer workload challenges defendant Kurtz identified during his prepared

5    remarks.  In response, defendant Kurtz claimed the referenced workload issues were

6    "just staffing challenges in practices."  This statement was materially false and

7    misleading when made because RxSight's own field-support shortcomings and

8    cohort-specific needs – not merely customer staffing – had been depressing adoption

9    and utilization.

10        45.    Defendant Kurtz further represented that the business trends that

11   impacted RxSight's first quarter results had "roughly stabilized" by the end of April,

12   which he claimed "was something that we also saw in our numbers."  This statement

13   was materially false and misleading when made because RxSight was then-

14   experiencing declines in LALs and a drop in LDDs of more than 40%, contradicting

15   his claims of stabilization.

16        46.    Then, on July 8, 2025, RxSight issued a release reporting preliminary

17   2Q25 financial results.  Contrary to defendants' statements that business trends had

18   "stabilized," the 2Q25 preliminary results release revealed that RxSight's LDD sales

19   had cratered to 40 units, down from 73 units in the prior quarter, representing a

20   decline of nearly 45%.  In addition, the 2Q25 preliminary results release reported

21   that RxSight's sales of LAL in the quarter had fallen sequentially in the first quarter

22   to less than 27,400 units in the second quarter, revealing that utilization of the

23   Company's system had continued to deteriorate for the second quarter in a row.  As

24   a result, RxSight cut its annual revenue guidance for a second time, adjusting it

25   downward by more than $27 million at the midpoint to a range of $120 million to

26   $130 million from a range of $160 million to $175 million, confirming that

27   utilization trends would continue to deteriorate.

28

47.     During the corresponding conference call held that same day, defendant Kurtz attributed the LAL and LDD sales declines to a "slower ramp" in LAL utilization by newer customers.  As a result, defendant Kurtz announced that RxSight was "executing a commercial pivot" to reverse utilization trends.  As part of this "pivot," defendant Kurtz announced that RxSight would be overhauling its "field support" by implementing various initiatives "designed to close adoption gaps, enhance customer satisfaction, and to support sustained utilization trends."

48.     During the call, an analyst pressed defendants to be "more specific" about how the Company could "improve utilization" and to identify "what[] [was] wrong," noting he thought the Company was "already" performing the initiatives defendant Kurtz had announced.  In response, defendant Kurtz revealed that new customer cohorts "require[d] more support to get started and to move up the adoption curve," the lack of which had adversely impacted adoption "over the last few quarters."  On this news, the price of RxSight common stock fell from $12.79 per share on July 8, 2025 to below $8.00 per share on July 9, 2025, a decline of nearly 38%, on above-average trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

49.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading. Defendants knowingly participated in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding RxSight, and their control over and/or receipt and/or modification of RxSight's allegedly materially misleading misstatements, were active and culpable participants in the fraud alleged herein.

50.    The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.    Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.    As a result, each of the defendants is responsible for the accuracy of RxSight's corporate statements and is, therefore, responsible and liable for the representations contained therein.

51.    RxSight's utilization rates, customer cohorts, and client relationships were among the most important issues facing the Company and the focus of RxSight management, including the Individual Defendants, during the Class Period.    The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding their customers and their experiences with the Company's products.    For example, during RxSight's November 7, 2024 earnings call, defendant Thunen represented that she and others at RxSight were "very close to [their customers] week by week, in the field" to assure investors regarding some of the seasonal patterns exhibited by the Company's results.    Defendant Kurtz similarly claimed during the same call that he and others at RxSight were "always . . . looking at individual practices" to assess how the Company could "make them grow faster."

52.    Defendants also had the motive and opportunity to defraud investors. Capitalizing on the artificially inflated price of RxSight shares, defendants caused the Company to conduct a secondary offering on May 9, 2024, in which it sold more than 1.7 million shares at $56 per share for nearly $100 million in proceeds.    The offering was suspiciously timed to occur before the 2024 customer cohort adoption issues were revealed to the market and while the price of RxSight common stock

1   was at near all-time highs, allowing defendants to take full advantage of their
2   misconduct.

3                              **LOSS CAUSATION**

4          53.    During the Class Period, as detailed herein, defendants engaged in a
5   scheme and wrongful course of business that was designed to and did artificially
6   inflate the price of RxSight common stock, which misconduct operated as a fraud
7   and deceit on Class Period purchasers of RxSight common stock by failing to
8   disclose and misrepresenting the adverse facts detailed herein.  When the falsity of
9   defendants' misrepresentations and fraudulent conduct was revealed, the price of
10  RxSight common stock declined on April 3, 2025 and on July 9, 2025, as detailed in
11  ¶¶39 and 46-48, as the artificial inflation dissipated.  As result of their purchases of
12  artificially inflated RxSight common stock during the Class Period, plaintiff and
13  other Class members (defined below) suffered significant damages under the federal
14  securities laws.

15         54.    The market for RxSight common stock was open, well-developed, and
16  efficient at all relevant times, with an average daily trading volume of more than
17  680,000 shares during the Class Period.  As a result of the materially misleading
18  statements and failures to disclose the true state of the Company's business
19  performance and financial circumstances, RxSight common stock traded at
20  artificially inflated prices.  Plaintiff and other Class members purchased RxSight
21  common stock relying upon the integrity of the market relating to RxSight common
22  stock and suffered economic loss as a result thereof.

23         55.    Defendants' false or misleading statements had the intended effect and
24  caused RxSight common stock to trade at artificially inflated prices.

25         56.    The timing and magnitude of RxSight's significant stock price declines
26  negate any inference that the losses suffered by plaintiff and other Class members
27  were caused by changed market conditions, macroeconomic or industry factors, or
28  Company-specific facts unrelated to defendants' fraudulent conduct.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**

57.    At all relevant times, the market for RxSight common stock was an efficient market for at least the following reasons:

(a)    RxSight common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient, national stock market;

(b)    as a regulated issuer, RxSight filed periodic public reports with the SEC;

(c)    according to the Company's Form 10-Q for the quarterly period ended June 30, 2025, RxSight had approximately 40 million shares of common stock outstanding as of July 31, 2025.  During the Class Period, on average, more than 680,000 shares of RxSight common stock were traded on a daily basis, demonstrating an active and broad market for RxSight common stock;

(d)    RxSight was qualified to file a less-comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(e)    RxSight regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(f)    RxSight was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period and each of these reports was publicly available and entered the public marketplace; and

(g)    unexpected material news about RxSight was rapidly reflected in and incorporated into prices for RxSight common stock during the Class Period.

58.    As a result of the foregoing, the market for RxSight common stock promptly digested current information regarding RxSight from publicly available sources and reflected such information in the price of RxSight common stock.  Under

1    these circumstances, all purchasers of RxSight common stock during the Class

2    Period suffered similar injury through their purchases of RxSight common stock at

3    artificially inflated prices, and a presumption of reliance applies.

4         59.    A Class-wide presumption of reliance is also appropriate in this action

5    under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406

6    U.S. 128 (1972), because the Class's claims are, in large part, grounded on

7    defendants' material omissions.  Because this action involves defendants' failure to

8    disclose material adverse information regarding the Company's business operations

9    and financial prospects – information that defendants were obligated to disclose –

10   positive proof of reliance is not a prerequisite to recovery.  All that is necessary is

11   that the facts withheld be material in the sense that a reasonable investor might have

12   considered them important in making investment decisions.  Given the importance

13   of the Class Period material misstatements and omissions set forth above, that

14   requirement is satisfied here.

**CLASS ACTION ALLEGATIONS**

16        60.    Plaintiff brings this action as a class action on behalf of a class

17   consisting of all persons who purchased RxSight common stock during the Class

18   Period (the "Class").  Excluded from the Class are defendants, the Company's

19   officers and directors at all relevant times, as well as their immediate families, legal

20   representatives, heirs, successors, or assigns, and any entity in which defendants

21   have or had a controlling interest.

22        61.    The Class members are so numerous and geographically dispersed that

23   joinder of all members is impracticable.  Throughout the Class Period, RxSight

24   common stock was actively traded on the NASDAQ.  While the exact number of

25   Class members is unknown to plaintiff, RxSight reported over 40 million shares

26   outstanding as of July 31, 2025 and Yahoo!Finance reports at least 244 institutions

27   hold RxSight shares.  Record owners and other Class members may be identified

28   from records maintained by RxSight or its transfer agent and may be notified of the

pendency of this action using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class. Accordingly, plaintiff reasonably believes that there are hundreds, if not thousands, of Class members.

62. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

63. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

64. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether defendants violated the federal securities laws as alleged herein;

(b) whether the price of RxSight common stock was artificially inflated during the Class Period; and

(c) the extent of injuries sustained by the Class members and the appropriate measure of damages.

65. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and
Rule 10b-5 Against All Defendants**

66.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of RxSight common stock during the Class Period.

69.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for RxSight common stock.  Plaintiff and the Class would not have purchased RxSight common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

70.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of RxSight common stock during the Class Period.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

71.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.    During the Class Period, defendants acted as controlling persons of RxSight within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about RxSight, the Individual Defendants had the power and ability to control the actions of RxSight and its employees.  RxSight controlled the Individual Defendants and all of its other officers and employees.  Defendants were also culpable participants of the fraudulent scheme as detailed herein.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and plaintiff's counsel as Lead Counsel;

B.    Declaring that defendants are liable pursuant to the 1934 Act;

C.    Awarding compensatory damages in favor of plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D.    Awarding plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs, and expenses incurred in this action; and

E.    Awarding such other relief as the Court may deem just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  September 16, 2025

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS (168593)
DANIELLE S. MYERS (259916)
FRANCISCO J. MEJIA (306477)

s/ Danielle S. Myers
DANIELLE S. MYERS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
drobbins@rgrdlaw.com
dmyers@rgrdlaw.com
fmejia@rgrdlaw.com

Attorneys for Plaintiff

- 20 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Olga Gémesi ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this __15__ day of September, 2025.

_____
                                                 Olga Gémesi

RXSIGHT

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/15/2024 | 10.2850 | $48.85 |
| 11/12/2024 | 15 | $45.80 |

Prices listed are rounded to two decimal places.